**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

HEMAL GADA, M.D.,                                    Civil Action No. _____

        Plaintiff,

        v.

UPMC and PINNACLE HEALTH
CARDIOVASCULAR INSTITUTE, INC.
a/k/a UPMC HEART AND VASCULAR
INSTITUTE,

        Defendants.                    JURY TRIAL DEMANDED

## CIVIL COMPLAINT

Plaintiff Hemal Gada, M.D., by undersigned counsel, files this Civil Complaint, and in support thereof, aver as follows:

### I.      Jurisdiction

1.      The jurisdiction of this Court is invoked pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5(f)(3), as amended by the Civil Rights Act of 1991, and 42 U.S.C. § 1331. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

### II.     Venue

2.      Venue is proper in the Western District of Pennsylvania, in that at least one Defendant's registered address is located in Allegheny County, Pennsylvania.

### III.     Administrative Exhaustion

3.      Plaintiff has satisfied all the procedural and administrative requirements set forth in Section 706 of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5, as amended, and in particular:

a.   filed a timely Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) on August 28, 2025 against Defendant.

b.   cross-filed a timely Charge of Discrimination with the Pennsylvania Human Relations Commission (PHRC) on August 28, 2025.

c.   received a Notice of Right to Sue from the EEOC dated March 31, 2026 and this action was filed with this Court within 90 days of receipt of such Notice.

### IV.   Parties

4.   Plaintiff Hemal Gada, M.D., is an adult individual who resides in Cumberland County, Pennsylvania.

5.   Defendant UPMC is organized and is operating as a corporation or other legal entity under the laws of the Commonwealth of Pennsylvania with a principal place of business located at U.S. Steel Tower, Floor 56, 600 Grant Street, Pittsburgh, Allegheny County, Pennsylvania 15219. UPMC is an employer engaged in an industry affecting interstate commerce and has 15 or more employees for each working day in each of 20 or more calendar weeks in the current and/or preceding year.

6.   Defendant PinnacleHealth Cardiovascular Institute, Inc. a/k/a UPMC Heart and Vascular Institute ("Defendant HVI") is organized and is operating as a corporation or other legal entity under the laws of the Commonwealth of Pennsylvania with a principal place of business located at 409 S. Second Street, Suite 2C, P.O. Box 8700, Harrisburg, Dauphin County, Pennsylvania 17105. Defendant HVI is an employer engaged in an industry affecting interstate commerce and has 15 or more employees for each working day in each of 20 or more calendar weeks in the current and/or preceding year.

7.   Defendant HVI is a division of UPMC that provides healthcare services

through physicians practicing in various medical specialties.

8.      Defendants UPMC and HVI are a "single employer" given their affairs are so interconnected that they collectively caused the retaliation of Plaintiff in that:

a.      Defendants have a high degree of operational entanglement between them;

b.      Defendants have unity with respect to ownership, management and business functions;

c.      Defendants present themselves as a single company such that third parties dealt with them as one unit; and

d.      Defendants have financial entanglement relating to salaries and expenses.

9.      While Defendants classified Plaintiff as an employee of Defendant HVI, Defendants UPMC and HVI jointly employed Plaintiff at all relevant times. Among other things, Defendant UPMC set the terms of Plaintiff's employment, including the establishment, interpretation, application, and enforcement of UPMC policies that pertained to Plaintiff's employment.

10.     At all relevant times, Defendants, individually and in combination, operated as Plaintiff's "employer" within the meaning of Title VII.

11.     At all times relevant hereto, Defendants acted or failed to act by and through their duly authorized agents, servants and employees, who conducted themselves within the scope and course of their employment.

12.     At all times relevant hereto Defendants acted or failed to act by and through their duly authorized agents, servants and employees, who conducted themselves within the scope and course of their employment.

3

## V.    Factual Background

**Title VII Retaliation**

13.    On October 20, 2015, Plaintiff started working for PinnacleHealth Hospitals as an Interventional Cardiologist Physician who specializes in structural heart interventions.

14.    At all times, Plaintiff performed his job with the utmost skill, ability and dedication and had never received any warnings of performance problems or other concerns relating to his employment.

15.    In 2017, PinnacleHealth Hospitals merged with UPMC. As part of the merger, PinnacleHealth Cardiovascular Institute, Inc. integrated into the existing UPMC Heart and Vascular Institute ("Defendant HVI").

16.    Plaintiff served as President of HVI at UPMC Central PA from June 2020 until his termination on August 13, 2025.

17.    In late 2023, there began many heated conversations over the creation and implementation of an Interventional Cardiology Fellowship; Plaintiff and other physicians supported the Fellowship, and Drs. William Bachinsky and Randy Hubbard spearheaded the opposition to the Fellowship.

18.    In mid-April 2025, Erik Toth (VP Cardiovascular, Critical Care, Hospitalist, Pulmonary, and Thoracic Services) told Plaintiff that he filed an HR complaint over racist texts by Drs. Bachinsky and Hubbard regarding the Fellowship.

19.    Plaintiff soon thereafter became aware of the content of the texts, which included comments indicating that patients do not like to be treated by brown physicians with accents and wishing luck with the effort to replace white doctors with brown ones.

20.     In late April 2025, Plaintiff engaged in protected activity when he emailed a complaint regarding the racist texts to David Gibbons (Regional President), who replied that Mr. Toth was coordinating a resolution to this issue.

21.     Plaintiff engaged in further protected activity when in early May 2025 and in late May 2025, he met with Alison Beck (UPMC Central PA HR) to discuss Mr. Toth's HR complaint and Plaintiff's offense to the racist texts.

22.     Dr. Bachinsky was aware of Plaintiff's opposition to the racist texts and that Plaintiff spoke with HR regarding the texts.

23.     On Sunday, August 3, 2025, during a TEAMS meeting, Ms. Beck informed Plaintiff of an HR investigation into Plaintiff's professional conduct and that Dr. John Goldman (VP of Medical Affairs) and Dr. Anthony Guarracino (Medical Staff President) identified alleged clinical performance and conduct concerns of Plaintiff that were reported to the Medical Executive Committee ("MEC").

24.     Later that morning, Drs. Goldman and Guarracino informed Plaintiff that he was being placed on a two-week precautionary paid suspension.

25.     On August 6, 2025, Plaintiff received a letter, signed by Drs. Goldman and Guarracino identifying Plaintiff's alleged performance and conduct issues.

26.     That same day, Plaintiff submitted a response explaining why the allegations were unfounded.

27.     The MEC was scheduled to meet on August 14, 2025 as part of its due process, and Plaintiff was to attend the meeting.

28.     On August 13, 2025, Defendants and Defendants' counsel held an emergency HVI Board meeting, but did not invite Plaintiff to attend despite Plaintiff serving

5

as HVI Board President.

29.     Throughout the August 13, 2025 meeting, Dr. Bachinsky, who attempted to solicit negative information about Plaintiff from other Board members, physicians, and staff in advance of the meeting, actively tainted Plaintiff's reputation, judgment and character and tried to add to the allegations against Plaintiff.

30.     The HVI Board voted to terminate Plaintiff without the required super-majority threshold.

31.     That evening, Mr. Gibbons called Plaintiff and informed him of his termination with cause.

32.     The termination vote served to cancel the MEC meeting that had been scheduled for August 14, 2025.

33.     At no time did the MEC consider the allegations involving Plaintiff's alleged clinical performance and conduct issues.

**PA Whistleblower Law**

34.     Plaintiff has been a vocal critic of Edwards Lifesciences' ("Edwards") clinical trial data with regard to data transparency and of the company's spinning of scientific premise and data to support clinical marketing and sales initiatives.

35.     The above conduct has been especially concerning to Plaintiff given the harmful impact on patient care globally.

36.     Starting in December 2023, Plaintiff dissected a clinical trial of Edwards' SAPIEN 3 valve, PARTNER 3, (especially with regard to its 5-year follow up data) on LinkedIn.

37.     Some posts received tens of thousands of views.

38. Plaintiff's LinkedIn profile was viewed regularly by several Edwards employees and others in the medical community.

39. On December 23, 2024, Plaintiff noticed several members of Defendant UPMC leadership looking at his LinkedIn profile.

40. Plaintiff learned there had been an external complaint via the UPMC compliance hotline which prompted an investigation into Plaintiff's social media use.

41. In January 2025, Plaintiff discovered that Leslie Davis (UPMC President & CEO) serves on the Board of Directors of Edwards and has done so as of May 2024.

42. Ms. Davis, however, does not identify her Board position with Edwards on her LinkedIn page.

43. Ms. Davis's position on the Edwards Board of Directors is a paid one, according to SEC filings.

44. Upon learning this information, Plaintiff shared it with other Interventional Cardiologists (including Drs. Bill Bachinsky and Randy Hubbard).

45. Plaintiff also reported this information to UPMC's Office of Ethics, Compliance and Audit Services without anonymity and forwarded the Compliance hotline phone number to several colleagues, including Dr. John Goldman (VP Medical Affairs), Dr. Troy Moritz (Medical Executive Committee member), and Dr. Scott Owens (Medical Executive Committee member), all of whom were previously unaware of the information.

46. On January 13, 2025, Dr. Jason Marx (then-Chief Medical Officer, UPMC Central PA) called Plaintiff and informed him that the investigation into Plaintiff's social media use revealed no wrongdoing.

47. On January 13, 2025, Plaintiff emailed Mark Tamburri (UPMC Chief Legal

Officer) the following complaint:

> *I'm an interventional cardiologist at UPMC Harrisburg and the president of the UPMC Heart and Vascular Institute in Central PA. I do a lot of work in structural heart disease and implant many transcatheter heart valves. I've been very outspoken about issues regarding one particular valve platform (SAPIEN 3) manufactured by the company Edwards Lifesciences. I've posted many of my concerns on the social media platform LinkedIn and those have gotten some attention/notoriety, both good and bad. My focus is on issues with data transparency surrounding research on that heart valve.*
>
> *Our CMO, Jason Marx, told me that there was an "investigation" into my social media use right before Christmas due to concerns he could not elaborate. I have come to find out that our CEO, Leslie Davis, is on the Board of Directors of Edwards Lifesciences, appointed in May 2024. Today, Dr. Marx indicated that the investigation has not reflected anything troublesome about my social media use. While that is reassuring, I am still concerned about the origins of the investigation and the potentially significant conflict of interest (which appears undisclosed to a large degree) due to the CEO's potentially compensated Board appointment. I have notified Compliance of my concerns as they relate to our on-going clinical trials in the structural heart space, vendor relationships, supply chain issues, etc. My concerns about my personal/professional welfare are separate.*
>
> *I would very much like to elaborate upon the above and potential current and future ramifications when you have time.*
>
> *Please let me know if we can connect during the ensuing week.*

48.    Two days later, Christine Miller (UPMC Senior Associate Counsel and Vice President, Legal) contacted Plaintiff to discuss Plaintiff's concerns and to schedule a meeting the following week.

49.    By January 14, 2025, Plaintiff discovered, via www.jetspy.com, that Ms. Davis used the UPMC jet to attend Edwards Board meetings.

50.    On January 15, 2025, Plaintiff discussed Ms. Davis's Edwards Board role

and the jet use with Dr. Mike Mathier (head of the Value Analysis Team for Defendant HVI, and Executive Clinical Director of Defendant HVI); Dr. Mathier stated that he was unaware of Ms. Davis's jet usage for such a purpose and expressed concern, especially given how hard it has become to campaign for technology to which many/all other high volume academic cardiovascular centers have access because of the system's financial issues.

51.    Within days of the above call, Ms. Miller emailed Plaintiff to thank him for discussing the issues regarding Ms. Davis and informed Plaintiff that his complaint (which was forwarded to the Conflict-of-Interest team) was closed.

52.    Plaintiff's above conduct constitutes reporting "wrongdoing" and/or "waste" under the PWL as follows:

a.    in January 2025, Plaintiff reported to various individuals within UPMC that Ms. Davis had a conflict of interest by participating as a compensated Board member on the Edwards Lifesciences' Board of Directors and using the UPMC jet for personal and non-UPMC matters;

b.    Ms. Davis was appointed to the Edwards' Board in May 2024, after Plaintiff began his criticism of the Edwards Lifesciences' trial data on his LinkedIn page;

c.    Edwards Lifesciences, a medical device company, sells devices to UPMC, a non-profit healthcare institution;

d.    Neither the UPMC Value Analysis Team nor any of the providers that perform valve interventions using Edwards valves were aware of this conflict of interest until Plaintiff made this information known in January 2025;

e.    Many of Plaintiff's colleagues shared his concerns regarding Ms. Davis;

f.    Ms. Davis's compensated position on the Edwards' Board impacts UPMC's institutional independence in

9

being able to justify medical device use in a scientifically uncompromised way;

g.    Given Ms. Davis's Board position, she would necessarily be required to refrain from involvement in any dealings with Edwards, an entity with which UPMC engaged in multi-million dollar transactions across the health system;

h.    Ms. Davis, according to SEC filings, received from Edwards compensation in excess of $300,000 in equity and additional compensation, both in 2024 and 2025; and

i.    Ms. Davis, who is CEO of UPMC, a non-profit entity, used the UPMC jet to attend Edwards' Board meetings and potentially other Edwards engagements.

53.    Plaintiff made a good faith report of wrongdoing by Ms. Davis where such wrongdoing was not of a merely technical or minimal nature of a Federal or State statute or regulation.

54.    Rather than addressing Plaintiff's reported concerns, Defendants dismissed his complaint and retaliated against Plaintiff by terminating him.

**Count I**
**42 U.S.C. § 2000e, *et seq.* - Retaliation**

55.    Plaintiff incorporates by reference the allegations in Paragraphs 1 to 54 as if fully restated herein.

56.    Plaintiff opposed the racial harassment to which he was subjected by Defendant.

57.    Defendant terminated Plaintiff in retaliation for his opposition to race harassment, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, as amended by the Civil Rights Act of 1991.

10

58.    Defendant's actions were taken with malice or reckless indifference to Plaintiff's federally protected rights.

59.    As a result of Defendant's actions, Plaintiff has lost the benefits of employment and has suffered humiliation, emotional distress and a loss of reputation in the medical field.

WHEREFORE, Plaintiff demands judgment pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, as amended by the Civil Rights Act of 1991 as follows:

a.    That the Court enter a judgment declaring Defendant's actions to be unlawful and in violation of the Title VII of the Civil Rights Act of 1964, as amended;

b.    That Defendant be ordered to reinstate Plaintiff into the position he occupied prior to Defendant's discriminatory actions, together with all benefits incident thereto, including, but not limited to wages, benefits, training and seniority;

c.    That Defendant be required to compensate Plaintiff for the full value of wages he would have received had it not been for Defendant's illegal treatment of Plaintiff, with interest, in addition to reimbursement for lost pension, social security, experience, training opportunities and other benefits;

d.    That Defendant is required to provide Plaintiff with front pay if the Court determines reinstatement is not feasible;

e.    That Defendant be required to compensate Plaintiff for lost benefits, including profit sharing and/or pension benefits until Plaintiff's normal retirement date;

f.    That Plaintiff be awarded compensatory damages in an amount to be determined at trial;

g.    That Plaintiff is awarded punitive damages in an amount to be determined at trial;

h.    That Defendant be enjoined from discriminating or

11

retaliating against Plaintiff in any manner prohibited by Title VII;

i.    That Plaintiff be awarded against Defendant the costs and expenses of this litigation, including a reasonable attorney's fee; and

j.    That Plaintiff be granted such further legal and equitable relief as the Court may deem just and proper.

**Count II**
**PA Whistleblower Law**

60.    Plaintiff incorporates by reference the allegations in Paragraphs 1 to 59 as if fully restated herein.

61.    The Pennsylvania Whistleblower's Law provides:

(a)    Persons not to be discharged. - No employer may discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee or a person acting on behalf of the employee makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste.

(b)    Discrimination prohibited. - No employer may discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee is requested by an appropriate authority to participate in an investigation, hearing or inquiry held by an appropriate authority or in a court action.

62.    Defendants are an "employer" and "public body" because they employed Plaintiff and are funded "in any amount" by or through the Commonwealth of Pennsylvania or political subdivision.

63.    Section 255.7 of the Pennsylvania Code is designed to protect the interest

12

of the public and the employer, and the violation of this code of conduct is not merely technical or minimal in nature. The failure to obtain advance approval is "wrongdoing."

64.    The expenditure of state funds without advance approval is "waste".

65.    Defendants discriminated against the Plaintiff because the Plaintiff made a good faith report of an instance of wrongdoing or waste.

66.    Defendants retaliated against Plaintiff because Plaintiff made a good faith report to Defendant of an instance of wrongdoing or waste by Defendant as defined by the PWL.

67.    As a result of Defendants' actions, Plaintiff has lost the benefits of employment and has suffered humiliation, emotional distress and a loss of reputation in the medical field.

WHEREFORE, Plaintiff demands judgment pursuant to the Pennsylvania Whistleblower Law as amended by the Civil Rights Act of 1991 as follows:

a.    That the Court enter a judgment declaring Defendants' actions to be unlawful and in violation of the PWL;

b.    That Defendant be ordered to reinstate Plaintiff into the position he occupied prior to Defendants' discriminatory actions, together with all benefits incident thereto, including, but not limited to wages, benefits, training and seniority;

c.    That Defendant be required to compensate Plaintiff for the full value of wages he would have received had it not been for Defendants' illegal treatment of Plaintiff, with interest, in addition to reimbursement for lost pension, social security, experience, training opportunities and other benefits;

d.    That Defendant is required to provide Plaintiff with front pay if the Court determines reinstatement is not feasible;

e.    That Defendant be required to compensate Plaintiff for lost benefits, including profit sharing and/or pension benefits until Plaintiff's normal retirement date;

f.    That Plaintiff be awarded compensatory damages in an amount to be determined at trial;

g.    That Plaintiff is awarded punitive damages in an amount to be determined at trial;

h.    That Defendant be enjoined from discriminating or retaliating against Plaintiff in any manner prohibited by the PWL;

i.    That Plaintiff be awarded against Defendants the costs and expenses of this litigation, including a reasonable attorney's fee; and

j.    That Plaintiff be granted such further legal and equitable relief as the Court may deem just and proper.

Respectfully submitted:

*/s/ Colleen E. Ramage*
Colleen E. Ramage
PA I.D. No. 64413

Nikki Velisaris Lykos
PA I.D. No. 204813

**Ramage Lykos, LLC**
525 William Penn Place, 28th Floor
Pittsburgh, PA 15219
(412) 325-7700
cramage@ramagelykos.law
nlykos@ramagelykos.law

Attorneys for Plaintiff

14