**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

HEMAL GADA, M.D.,

        Plaintiff,

        v.

UPMC and PINNACLE HEALTH
CARDIOVASCULAR INSTITUTE, INC.
a/k/a UPMC HEART AND VASCULAR
INSTITUTE,

        Defendants.

Civil Action No. 2:26-cv-00524-JFC

Judge Joy Flowers Conti

JURY TRIAL DEMANDED

**AMENDED COMPLAINT**

Plaintiff Hemal Gada, M.D., by undersigned counsel, files this Amended Complaint, and in support thereof, avers as follows:

**I.     Jurisdiction**

1.     The jurisdiction of this Court is invoked pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5(f)(3), as amended by the Civil Rights Act of 1991, and 42 U.S.C. § 1331. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

**II.     Venue**

2.     Venue is proper in the Western District of Pennsylvania, in that at least one of Defendants' registered address is located in Allegheny County, Pennsylvania.

**III.     Administrative Exhaustion**

3.     Plaintiff has satisfied all the procedural and administrative requirements set forth in Section 706 of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5 ("Title VII"), as amended, and in particular:

a.    filed a timely Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) on August 28, 2025 against Defendants.

b.    cross-filed a timely Charge of Discrimination with the Pennsylvania Human Relations Commission (PHRC) on August 28, 2025.

c.    received a Notice of Right to Sue from the EEOC dated March 31, 2026 and this action was filed with this Court within 90 days of receipt of such Notice.

## IV.    Parties

4.    Plaintiff Hemal Gada, M.D., is an adult individual who resides in Cumberland County, Pennsylvania.

5.    Defendant UPMC is organized and is operating as a corporation or other legal entity under the laws of the Commonwealth of Pennsylvania with a principal place of business located at U.S. Steel Tower, Floor 56, 600 Grant Street, Pittsburgh, Allegheny County, Pennsylvania 15219. UPMC is an employer engaged in an industry affecting interstate commerce and has 15 or more employees for each working day in each of 20 or more calendar weeks in the current and/or preceding year.

6.    Defendant Pinnacle Health Cardiovascular Institute ("PHCVI"), Inc. a/k/a UPMC Heart and Vascular Institute ("Defendant HVI") is organized and is operating as a corporation or other legal entity under the laws of the Commonwealth of Pennsylvania with a principal place of business located at 409 S. Second Street, Suite 2C, P.O. Box 8700, Harrisburg, Dauphin County, Pennsylvania 17105. Defendant HVI is an employer engaged in an industry affecting interstate commerce and has 15 or more employees for each working day in each of 20 or more calendar weeks in the current and/or preceding year.

7.    Defendant HVI is a division of UPMC that provides healthcare services through physicians practicing in various medical specialties.

8.    The governing board of Defendant HVI is referred to herein as the "PHCVI Board of Directors" and "HVI Board" interchangeably.

9.    Defendants UPMC and HVI are a "single employer" given their affairs are so interconnected that they collectively caused the retaliation of Plaintiff in that:

   a.    Defendants have a high degree of operational entanglement between them;

   b.    Defendants have unity with respect to ownership, management and business functions;

   c.    Defendants present themselves as a single company such that third parties dealt with them as one unit; and

   d.    Defendants have financial entanglement relating to salaries and expenses.

10.    While Defendants classified Plaintiff as an employee of Defendant HVI, Defendants UPMC and HVI jointly employed Plaintiff at all relevant times. Among other things, Defendant UPMC set the terms of Plaintiff's employment, including the establishment, interpretation, application, and enforcement of UPMC policies that pertained to Plaintiff's employment.

11.    At all relevant times, Defendants, individually and in combination, operated as Plaintiff's "employer" within the meaning of Title VII.

12.    At all relevant times, Defendants, individually and in combination, operated as Plaintiff's employer within the meaning of the Pennsylvania Whistleblower Law, 43 P.S. § 1422, *set seq.* ("PWL").

13.    At all times relevant hereto, Defendants acted or failed to act by and through

3

their duly authorized agents, servants and employees, who conducted themselves within the scope and course of their employment.

14.    At all times relevant hereto Defendants acted or failed to act by and through their duly authorized agents, servants and employees, who conducted themselves within the scope and course of their employment.

## V.    Factual Background

### Title VII Retaliation

15.    On October 20, 2015, Plaintiff started working for Pinnacle Health Hospitals as an Interventional Cardiologist Physician who specializes in structural heart interventions.

16.    At all times, Plaintiff performed his job with the utmost skill, ability and dedication and had never received any warnings of performance problems or other concerns relating to his employment.

17.    In 2017, Pinnacle Health Hospitals merged with UPMC, which resulted in the integration of PHCVI into the existing UPMC Heart and Vascular Institute ("Defendant HVI").

18.    Plaintiff served as President of Defendant HVI at UPMC Central PA from June 2020 until his termination on August 13, 2025.

19.    In late 2023, there began many heated conversations over the creation and implementation of an Interventional Cardiology Fellowship; Plaintiff and other physicians supported the Fellowship, and Drs. William Bachinsky (Cardiac and Vascular Interventionalist and HVI Board Member) and Randy Hubbard (Director Interventional and Vascular Cardiology UPMC Harrisburg) spearheaded the opposition to the Fellowship.

20.     In mid-April 2025, Erik Toth (VP Cardiovascular, Critical Care, Hospitalist, Pulmonary, and Thoracic Services, and HVI Board Member) told Plaintiff that he filed an HR complaint over racist texts by Drs. Bachinsky and Hubbard regarding the Fellowship.

21.     Plaintiff soon thereafter became aware of the content of the texts, which included comments indicating that patients do not like to be treated by brown physicians with accents and wishing luck with the effort to replace white doctors with brown ones.

22.     In late April 2025, Plaintiff engaged in protected activity when he emailed a complaint regarding the racist texts to David Gibbons (Sr. VP, Health Services Division, and Regional President, UPMC, and HVI Board Member), who replied that Mr. Toth was coordinating a resolution to this issue.

23.     Plaintiff interpreted Mr. Gibbons' reply as an effort to ignore and dismiss Plaintiff's concern.

24.     Plaintiff engaged in further protected activity when, on May 7 and on May 30, 2025, he met with Alison Beck (Sr. Director, HR) to discuss Mr. Toth's HR complaint and Plaintiff's offense to the racist texts.

25.     Neither Ms. Beck, Mr. Toth, nor Mr. Gibbons met with Plaintiff to discuss any resolution regarding the offensive texts or the above antagonistic behavior towards Plaintiff and the Interventional Cardiology Fellowship.

26.     Dr. Bachinsky was aware of Plaintiff's opposition to the racist texts and that Plaintiff spoke with HR regarding the texts.

27.     After Plaintiff engaged in the above protected activity, Defendants engaged in further antagonistic behavior against Plaintiff, when for the first time in Plaintiff's tenure with Defendants, Defendants notified Plaintiff of an internal investigation of Plaintiff's

5

professional conduct and clinical performance. On Saturday, August 2, 2025, Dr. John Goldman (Vice President of Medical Affairs for UPMC Harrisburg, Community Osteopathic, and West Shore, UPMC Central PA and HVI Board Member) texted Plaintiff notification of a Sunday morning mandatory Teams meeting he organized in reference to an "HR and Med Staff issue" involving Plaintiff.

28.     Dr. Goldman did not indicate any specific reasons for the weekend meeting and would not answer his phone when Plaintiff called him to obtain further detail.

29.     On Sunday, August 3, 2025, during a 10-minute Teams meeting, Ms. Beck informed Plaintiff of an HR investigation into Plaintiff's professional conduct.

30.     During the same meeting, Dr. Goldman and Dr. Anthony Guarracino (Chair of Emergency Medicine and Medical Staff President) briefly described alleged clinical performance and conduct concerns of Plaintiff that were reported to the Medical Executive Committee ("MEC").

31.     Two hours later, Drs. Goldman and Guarracino informed Plaintiff that he was being placed on a two-week precautionary paid suspension.

32.     Immediately after the phone call, Plaintiff texted Mr. Gibbons to discuss the events, given Plaintiff's emotional distress, and Mr. Gibbons texted back, emphasizing the requirement to "follow due process."

33.     About an hour later, Dr. Bachinsky looked up Plaintiff on LinkedIn, despite Plaintiff posting no new content and continued to look up Plaintiff on LinkedIn through August 18, 2025.

34.     On August 6, 2025, Plaintiff received a letter signed by Drs. Goldman and Guarracino describing the MEC allegations resulting in Plaintiff's precautionary

6

suspension.

35.     That same day, Plaintiff submitted a response explaining why the allegations were unfounded.

36.     On August 7, 2025, Heather Johnson (Director Medical Staff and Credentialing of Physician & Practitioner Services) confirmed via email that she received Plaintiff's response to the suspension letter and forwarded it to Drs. Guarracino and Goldman.

37.     Within two hours of the e-mail from Ms. Johnson, Mr. Gibbons called Plaintiff and suggested that Plaintiff resign without providing Plaintiff with any substantive basis for doing so.

38.     Plaintiff did not resign.

39.     The MEC was scheduled to meet on August 14, 2025 as part of its due process, and Plaintiff was to attend the meeting.

40.     On August 13, 2025, Defendants and Defendants' counsel held an emergency HVI Board meeting, which was the first emergency meeting held during Plaintiff's tenure as HVI Board President, but did not invite Plaintiff to attend despite Plaintiff holding the position of HVI Board President.

41.     Dr. Bachinsky conveyed knowledge of the emergency Board meeting to at least one HVI Board Member before the invitation to the meeting was sent to all Board members except Plaintiff.

42.     Throughout the August 13, 2025 meeting, Dr. Bachinsky engaged in further antagonism towards Plaintiff by his attempting to solicit negative information about Plaintiff from other Board members, physicians, and staff in advance of the meeting,

actively tainting Plaintiff's reputation, judgment and character and trying to add to the allegations against Plaintiff.

43.     At the August 13, 2025 meeting, the HVI Board voted to terminate Plaintiff without the required super-majority threshold as provided for in Plaintiff's employment contract.

44.     That evening, Mr. Gibbons called Plaintiff and informed him of his termination for cause.

45.     The termination vote served to cancel the MEC meeting that had been scheduled for August 14, 2025, which was the established due process procedure afforded to Plaintiff to address the allegations raised against him.

46.     As a result of the cancellation of the August 14, 2025 MEC meeting, the MEC had no opportunity to consider the allegations against Plaintiff and Plaintiff's response to them.

**PA Whistleblower Law**

47.     Plaintiff has been a vocal critic of Edwards Lifesciences' ("Edwards") clinical trial data with regard to data transparency and of the company's spinning of scientific premise and data to support clinical marketing and sales initiatives.

48.     The above conduct has been especially concerning to Plaintiff given the harmful impact on patient care globally.

49.     In October 2023, Plaintiff attended a medical conference during which he attended presentations regarding Edwards' clinical trial of Edwards' SAPIEN 3 valve, PARTNER 3, and its five-year follow-up data that Plaintiff found highly questionable.

50.     As a result, Plaintiff, who already had a deep understanding of the data,

found additional Edwards' data published in the New England Journal of Medicine which caused Plaintiff to be critical of the presented information.

51.     Starting in December 2023, Plaintiff began a series of posts on LinkedIn detailing his dissection of this clinical trial data.

52.     Many of Plaintiff's LinkedIn posts received tens of thousands of views, most of which were supportive of Plaintiff's analysis.

53.     Plaintiff's LinkedIn profile was viewed regularly by several Edwards employees and others in the medical community.

54.     On December 23, 2024, Plaintiff noticed several members of Defendant UPMC's leadership looking at his LinkedIn profile.

55.     Plaintiff learned there had been an external complaint via the UPMC compliance hotline which prompted an investigation into Plaintiff's social media use.

56.     In January 2025, Plaintiff discovered that Leslie Davis (UPMC President & CEO) serves on the Board of Directors of Edwards and has done so since May 2024.

57.     Ms. Davis, however, does not identify her Board position with Edwards on her LinkedIn page.

58.     Ms. Davis's position on the Edwards Board of Directors is a paid one, according to SEC filings.

59.     Ms. Davis's Edwards Board of Directors position was not publicly disclosed by UPMC and such information was absent from Ms. Davis's UPMC profile on Defendants' website.

60.     Upon learning this information, Plaintiff shared it with other Cardiologists (including Drs. William Bachinsky, Randy Hubbard, and Mike Bosak, Chairman of

9

Cardiovascular Services UPMC Pinnacle at UPMC).

61.    Plaintiff also reported this information to UPMC's Office of Ethics, Compliance and Audit Services without anonymity (tracking number 2501UPP10043) and forwarded the Compliance hotline phone number to several colleagues, including Dr. John Goldman, Dr. Troy Moritz (Director of Thoracic Surgery at UPMC Pinnacle Health and MEC member), and Dr. Scott Owens (Urologist and MEC member).

62.    SEC filings and evidence of the Board position on Edwards website are available but were not disclosed to any of Defendants' executives and physicians with whom Plaintiff spoke.

63.    On January 13, 2025, Dr. Jason Marx (then-VP, Regional Physician Services & Health Services Division and President, Physician Services, UPMC Central PA) called Plaintiff and informed him that the investigation into Plaintiff's social media use revealed no wrongdoing.

64.    On January 13, 2025, Plaintiff emailed Mark Tamburri (UPMC Chief Legal Officer and Executive VP) the following complaint:

> *I'm an interventional cardiologist at UPMC Harrisburg and the president of the UPMC Heart and Vascular Institute in Central PA. I do a lot of work in structural heart disease and implant many transcatheter heart valves. I've been very outspoken about issues regarding one particular valve platform (SAPIEN 3) manufactured by the company Edwards Lifesciences. I've posted many of my concerns on the social media platform LinkedIn and those have gotten some attention/notoriety, both good and bad. My focus is on issues with data transparency surrounding research on that heart valve.*
>
> *Our CMO, Jason Marx, told me that there was an "investigation" into my social media use right before Christmas due to concerns he could not elaborate. I have come to find out that our CEO, Leslie Davis, is on the Board of Directors of Edwards Lifesciences, appointed in May 2024.*

10

*Today, Dr. Marx indicated that the investigation has not reflected anything troublesome about my social media use. While that is reassuring, I am still concerned about the origins of the investigation and the potentially significant conflict of interest (which appears undisclosed to a large degree) due to the CEO's potentially compensated Board appointment. I have notified Compliance of my concerns as they relate to our on-going clinical trials in the structural heart space, vendor relationships, supply chain issues, etc. My concerns about my personal/professional welfare are separate.*

*I would very much like to elaborate upon the above and potential current and future ramifications when you have time.*

*Please let me know if we can connect during the ensuing week.*

65.    Two days later, Christine Miller (Senior Associate Counsel & VP Legal Central for UPMC Department, UPMC) contacted Plaintiff to discuss Plaintiff's concerns and to schedule a meeting the following week.

66.    By January 14, 2025, Plaintiff discovered, via JetSpy (www.jetspy.com), that Ms. Davis used the UPMC jet to attend Edwards Board meetings.

67.    The above information was only available to Plaintiff via a paid subscription to this flight tracking website, which does not track flights based on publicly disclosed data.

68.    UPMC has historically attempted to prevent public tracking of its jet (https://www.post-gazette.com/frontpage/2013/10/25/New-jet-to-fly-UPMC-corporate-flag/stories/201310250134) and does not publicly disclose jet flights.

69.    Plaintiff became knowledgeable of the jet flights to Edwards Lifesciences Board meetings and potentially other Edwards engagements after he had recalled the investigative reporting discussing frequent UPMC jet trips to Boca Raton, broadcasted on WTAE on September 19, 2024. In that report, note is made of the UPMC jet returning

11

from a trip to California in July. After searching for Edwards Board meeting schedules, Plaintiff discerned the UPMC jet had traveled to John Wayne Airport in Orange County, CA (home of Edwards Lifesciences) during those periods.

70.    Per JetSpy, the UPMC jet first traveled to Orange County, CA in December 2023 at the time Plaintiff was criticizing the aforementioned Edwards Lifesciences clinical trial data and then next traveled there in May 2024 at the time of Ms. Davis's Board appointment. None of these jet trips, or the many that followed, were or have been subsequently publicly disclosed by UPMC.

71.    Several colleagues, including Drs. Randy Hubbard, William Bachinsky, and Mike Bosak, mentioned their fear of retaliation by UPMC when discussing the conflict of interest, the inappropriate jet use, and their disapproval of it.

72.    On January 15, 2025, Plaintiff discussed Ms. Davis's Edwards Board role and the jet use with Dr. Mike Mathier (Executive Clinical Director of Defendant HVI and head of the Value Analysis Team for Defendant HVI), who stated that he was unaware of Ms. Davis's jet usage for such a purpose and expressed concern, especially given how hard it has become to campaign for technology to which many/all other high volume academic cardiovascular centers have access because of the system's financial issues.

73.    Within days of the above call, Ms. Miller emailed Plaintiff to thank him for discussing the issues regarding Ms. Davis and informed Plaintiff that his complaint (which was forwarded to the Conflict-of-Interest team) was closed.

74.    Plaintiff's above conduct constitutes reporting "wrongdoing" and/or "waste" under the PWL as follows:

> a.    in January 2025, Plaintiff reported to various individuals within UPMC that Ms. Davis had a conflict

of interest by participating as a compensated Board member on the Edwards Lifesciences' Board of Directors and using the UPMC jet for personal and non-UPMC matters;

b.    Ms. Davis was appointed to the Edwards' Board in May 2024, after Plaintiff began his criticism of the Edwards Lifesciences' trial data on his LinkedIn page;

c.    Edwards Lifesciences, a medical device company, sells devices to UPMC, a non-profit healthcare institution;

d.    Neither the UPMC Value Analysis Team nor any of the providers that perform valve interventions using Edwards valves, or several other physicians and staff, were aware of this conflict of interest until Plaintiff made this information known in January 2025;

e.    Many of Plaintiff's colleagues shared his concerns regarding Ms. Davis;

f.    Ms. Davis's compensated position on the Edwards' Board impacts UPMC's institutional independence in being able to justify medical device use in a scientifically uncompromised way;

g.    Given Ms. Davis's Board position, she would necessarily be required to refrain from involvement in any dealings with Edwards, an entity with which UPMC engaged in multi-million dollar transactions across the health system;

h.    Ms. Davis, according to SEC filings, received from Edwards compensation in excess of $300,000 in equity and additional compensation, both in 2024 and 2025; and

i.    Ms. Davis, who is CEO of UPMC, a non-profit entity, used the UPMC jet to attend Edwards' Board meetings and potentially other Edwards engagements.

75.    Plaintiff made a good faith report of wrongdoing of Ms. Davis where such wrongdoing was not of a merely technical or minimal nature of a federal or state statute

13

or regulation, or of a code of conduct or ethics designed to protect the interest of the public or the employer, including UPMC's Code of Conduct and Conflict of Interest Policy.

76.     Plaintiff's complaint involved a violation of Defendant's Code of Conduct and Conflict of Interest Policy regarding Ms. Davis's derivation of personal gain and/or favors (i.e., a compensated Board position) from an entity with which Defendants engage in significant business.

77.     Defendants did not address Plaintiff's concerns and dismissed Plaintiff's complaint regarding Ms. Davis.

78.     After Plaintiff engaged in the above protected activity, Defendants engaged in antagonistic behavior against Plaintiff, when for the first time in Plaintiff's tenure with Defendants, Defendants notified Plaintiff of an internal investigation of Plaintiff's professional conduct.

79.     Defendants terminated Plaintiff without adhering to its own established process.

80.     The decision to suspend and terminate Plaintiff was made with the participation of Defendants' corporate leadership and legal counsel, including Mr. Gibbons, who conveyed both the suggestion that Plaintiff resign and Plaintiff's termination.

**<u>Breach of Contract</u>**

81.     On or about October 20, 2015, Plaintiff and Defendants entered into a written Physician Employment Agreement (the "PEA"), which was thereafter amended and renewed, including by amendments effective April 8, 2019 and January 1, 2021, and which remained in full force and effect through the date of Plaintiff's termination on August

13, 2025. (See PEA, attached as Exhibit 1).

82.    Plaintiff performed all of his material obligations under the PEA.

83.    By letter dated August 15, 2025, Defendants notified Plaintiff that his employment was terminated "with cause," asserting the following violations of the PEA:

a.    Sections 15(b)(8) for allegedly creating and fostering a toxic work environment for PHCVI, hospital physicians, Advanced Practice Providers and nurses, and that Plaintiff improperly cancelled stroke alerts for certain of Plaintiff's patients after TAVR procedures;

b.    Sections 15(b)(9) for allegedly creating and fostering a toxic work environment for PHCVI, hospital physicians, Advanced Practice Providers and nurses, and that Plaintiff improperly cancelled stroke alerts for certain of Plaintiff's patients after TAVR procedures;

c.    Section 15(b)(1) for allegedly losing Plaintiff's medical privileges at UPMC Pinnacle Hospitals resulting in Plaintiff's material inability to carry out his duties and responsibilities as an employed physician; and

d.    Section 15(b)(10) for allegedly materially breaching the PEA by failing to fulfill Plaintiff's physician responsibilities as provided in Exhibit A (Physician Responsibilities) of the PEA.

**Section 15(b)(8)**

84.    Plaintiff did not violate Section 15(b)(8) of the PEA as Plaintiff did not create and foster a toxic work environment for PHCVI, hospital physicians, Advance Practice Providers and nurses.

85.    Plaintiff did not violate Section 15(b)(8) of the PEA as Plaintiff did not improperly cancel stroke alerts for certain patients after TAVR procedures.

86.    Section 15(b)(8) of the PEA required a determination "by a super-majority of the PHCVI Board of Directors" whether Plaintiff's conduct "is likely to represent a threat

15

to the health or safety" of patients or employees or to disrupt patient care or operations.

87.     Defendants breached their obligation under Section 15(b)(8) of the PEA by failing to reach a super-majority vote of the Board prior to determining that Plaintiff engaged in such conduct.

88.     Defendants further breached their obligation under Section 15(b)(8) of the PEA by failing to provide Plaintiff with the required thirty (30) days' written notice and an opportunity to cure.

### Section 15(b)(9)

89.     Plaintiff did not violate Section 15(b)(9) of the PEA as Plaintiff did not create and foster a toxic work environment for PHCVI, hospital physicians, Advance Practice Providers and nurses.

90.     Plaintiff did not violate Section 15(b)(9) of the PEA as Plaintiff did not improperly cancel stroke alerts for certain patients after TAVR procedures.

91.     Section 15(b)(9) of the PEA required a determination "by a super-majority of the PHCVI Board of Directors" whether Plaintiff's conduct "is likely to result in actual harm to PHCVI's facilities, programs or strategic initiatives."

92.     Defendants breached their obligation under Section 15(b)(9) of the PEA by failing to reach a super-majority vote of the Board prior to determining that Plaintiff engaged in such conduct.

93.     Defendants further breached their obligation under Section 15(b)(9) of the PEA by failing to provide Plaintiff with the required thirty (30) days' written notice and an opportunity to cure.

### Section 15(b)(1)

16

94.     Plaintiff did not violate Section 15(b)(1) of the PEA as Plaintiff did not lose medical privileges at UPMC Pinnacle Hospitals; Defendants only imposed a precautionary suspension of Plaintiff's privileges on August 3, 2025, subject to review by the MEC at a meeting scheduled for August 14, 2025, at which time Plaintiff was entitled to be heard.

95.     Defendants' Medical Staff credentials policy, Section 6.C.1(c), states a "precautionary suspension is an interim step in the professional review activity and does not imply any final finding regarding the concerns supporting the suspension."

96.     Section 15(b)(1) of the PEA required a "[l]oss of Active Medical Staff membership, or a reduction or loss of medical privileges at PHH that results in Physician's material inability to carry out his or her duties and responsibilities as an employed physician."

97.     Defendants breached their obligations under Section 15(b)(1) the PEA as Plaintiff did not lose active medical staff membership or lose medical privileges resulting in a material inability to carry out his duties and responsibilities as an employed physician.

98.     Defendants further breached their obligation under Section 15(b)(1) of the PEA by failing to provide Plaintiff with the required thirty (30) days' written notice and an opportunity to cure.

### Section 15(b)(10)

99.     Plaintiff did not violate Section 15(b)(10) of the PEA as Plaintiff was available and willing to fulfill Plaintiff's physician responsibilities as provided in Exhibit A (Physician Responsibilities) of the PEA.

100.    Defendants breached Section 15(b)(10) by preventing Plaintiff from fulfilling

17

his physician responsibilities.

101.  The conduct Defendants characterized as a "material breach" under Section 15(b)(10) is the same conduct Defendants asserted under Sections 15(b)(8) and 15(b)(9), and Defendants may not recharacterize that conduct as a generic material breach under Section 15(b)(10) in order to evade the super-majority determination and the thirty (30) day notice-and-cure requirements applicable to Sections 15(b)(8) and 15(b)(9).

102.  To the extent Plaintiff did not perform any responsibility set forth in Exhibit A, such non-performance was caused by Defendants' own conduct in suspending Plaintiff on August 3, 2025 and terminating him on August 13, 2025.

**Section 1**

103.  The PEA provided, in Section 1, that Plaintiff "shall be treated fairly and similarly to other PHCVI physicians."

104.  Defendants did not treat Plaintiff fairly and similarly to other PHCVI physicians.

105.  Defendants breached Section 1 of the PEA by subjecting Plaintiff to an accelerated for-cause termination process that materially departed from the treatment afforded other PHCVI physicians.

106.  In particular, the physicians who authored the racist text messages that Plaintiff reported and opposed, and other physicians who engaged in conduct comparable to or more serious than the conduct alleged against Plaintiff, were not subjected to precautionary suspension, an emergency Board meeting, or "for-cause" termination, and were afforded the due process that Defendants denied Plaintiff.

107.   PHCVI maintained an established process for addressing alleged physician conduct, set forth in the PHCVI Cardiologist Compact (the "Compact"), which Plaintiff executed on or about October 11, 2017.

108.   Pursuant to the Compact, a complaint of conduct contrary to the Compact was to be submitted in writing to the President and the Board, reviewed by a panel of three physicians who would interview the physician and present findings to the Board, with corrective action escalating from a letter of reprimand through dismissal only thereafter.

109.   Defendants disregarded the established process as set forth in the Compact.

110.   Defendants' disregard for the established process as set forth in the Compact resulted in disparate treatment of Plaintiff that Defendants owed to Plaintiff under Section 1 of the PEA.

### Count I
### 42 U.S.C. § 2000e, *et seq.* - Retaliation

111.   Plaintiff incorporates by reference the allegations in Paragraphs 1 to 110 as if fully restated herein.

112.   Plaintiff engaged in protected activity when he opposed racial harassment in Defendants' workplace that he reasonably believed to be unlawful.

113.   Defendants terminated Plaintiff in retaliation for his protected activity, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, as amended by the Civil Rights Act of 1991.

114.   Defendants' actions were taken with malice or reckless indifference to Plaintiff's federally protected rights.

19

115. As a result of Defendants' actions, Plaintiff has lost the benefits of employment and has suffered humiliation, emotional distress and a loss of reputation in the medical field.

WHEREFORE, Plaintiff demands judgment pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, as amended by the Civil Rights Act of 1991 as follows:

a.  That the Court enter a judgment declaring Defendants' actions to be unlawful and in violation of the Title VII of the Civil Rights Act of 1964, as amended;

b.  That Defendants be ordered to reinstate Plaintiff into the position he occupied prior to Defendants' discriminatory actions, together with all benefits incident thereto, including, but not limited to wages, benefits, training and seniority;

c.  That Defendants be required to compensate Plaintiff for the full value of wages he would have received had it not been for Defendants' illegal treatment of Plaintiff, with interest, in addition to reimbursement for lost pension, social security, experience, training opportunities and other benefits;

d.  That Defendants are required to provide Plaintiff with front pay if the Court determines reinstatement is not feasible;

e.  That Defendants be required to compensate Plaintiff for lost benefits, including profit sharing and/or pension benefits until Plaintiff's normal retirement date;

f.  That Plaintiff be awarded compensatory damages in an amount to be determined at trial;

g.  That Plaintiff is awarded punitive damages in an amount to be determined at trial;

h.  That Defendants be enjoined from discriminating or retaliating against Plaintiff in any manner prohibited by Title VII;

i.  That Plaintiff be awarded against Defendants the costs

and expenses of this litigation, including a reasonable attorney's fee; and

j.      That Plaintiff be granted such further legal and equitable relief as the Court may deem just and proper.

## Count II
## PA Whistleblower Law

116.    Plaintiff incorporates by reference the allegations in Paragraphs 1 to 115 as if fully restated herein.

117.    Pennsylvania law protects employees who report or were about to report an instance of wrongdoing or waste. 43 P.S. 1423, *et seq*.

118.    The PWL provides:

(a)     Persons not to be discharged. - No employer may discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee or a person acting on behalf of the employee makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste.

(b)     Discrimination prohibited. - No employer may discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee is requested by an appropriate authority to participate in an investigation, hearing or inquiry held by an appropriate authority or in a court action.

119.    Defendants are an "employer" and "public body" because they employed Plaintiff and are funded "in any amount" by or through the Commonwealth of Pennsylvania or political subdivision.

120.    Defendants receive funding in the form of Pennsylvania Medical Assistance

21

(Medicaid Rebate) funding and 340B (of the Public Health Service Act) Drug Reimbursement funding.

121.    At all relevant times, Defendants owned and operated acute-care hospitals and health-care facilities in the Commonwealth of Pennsylvania, including Harrisburg Hospital, that were and remain enrolled providers in the Pennsylvania Medical Assistance program (Pennsylvania's Medicaid program), which is administered by the Pennsylvania Department of Human Services ("DHS").

122.    The Pennsylvania Medical Assistance program is funded jointly by the Commonwealth of Pennsylvania and the federal government; the Commonwealth's share is appropriated by the General Assembly, and all Medical Assistance payments to enrolled providers, including both the Commonwealth's share and the federal share, are administered, processed, and disbursed by or through DHS, an agency of the Commonwealth.

123.    At all relevant times, Defendants' hospitals received, and continue to receive, substantial payments derived from Commonwealth funds and disbursed by or through DHS under the Medical Assistance program, including fee-for-service payments, HealthChoices managed-care payments, and Disproportionate Share Hospital payments. The specific amounts and payment records are presently within Defendants' exclusive possession and will be established through discovery.

124.    Defendants are therefore "funded in any amount by or through Commonwealth . . . authority" within the meaning of 43 P.S. § 1422 and are therefore a "public body" subject to the PWL.

125.    Plaintiff is a covered "Whistleblower" pursuant to 43 P.S. § 1422 given

22

Plaintiff is "[a] person who witnesses or has evidence of wrongdoing or waste while employed and who makes a good faith report of the wrongdoing or waste, verbally or in writing, to one of the person's superiors, to an agent of the employer or to an appropriate authority."

126.    Plaintiff reported "waste" pursuant to 43 P.S. § 1422 by reporting "[a]n employer's conduct or omissions which result in substantial abuse, misuse, destruction or loss of funds or resources belonging to or derived from Commonwealth or political subdivision sources."

127.    Plaintiff also reported "wrongdoing" pursuant to 43 P.S. § 1422 by reporting "[a] violation which is not of a merely technical or minimal nature of a Federal or State statute or regulation, of a political subdivision ordinance or regulation or of a code of conduct or ethics designed to protect the interest of the public or the employer."

128.    Specifically, Plaintiff reported the above wrongdoing to:

      a.    colleague physicians throughout Defendants' health system;

      b.    several administrators, including Mr. Toth, Drs. Goldman, Mathier, and Marx;

      c.    MEC members;

      d.    HVI Board members;

      e.    Defendants' legal counsel; and

      f.    Defendants' Compliance Hotline(tracking number 2501UPP10043).

129.    The PWL makes it unlawful for a covered employer to discharge an employee for making a good faith report of "wrongdoing or waste by a public body or an instance of waste by any other employer as defined in this act." 43 Pa. Stat. § 1423(a).

130.    Defendants discharged, discriminated and/or retaliated against Plaintiff,

23

who made a good faith report to Defendants of an instance of wrongdoing or waste as defined by the PWL.

131.    As a result of Defendants' actions, Plaintiff has lost the benefits of employment and has suffered humiliation, emotional distress and a loss of reputation in the medical field.

WHEREFORE, Plaintiff demands judgment pursuant to the PWL as follows:

a.    That the Court enter a judgment declaring Defendants' actions to be unlawful and in violation of the PWL;

b.    That Defendants be ordered to reinstate Plaintiff into the position he occupied prior to Defendants' discriminatory actions, together with all benefits incident thereto, including, but not limited to wages, benefits, training and seniority;

c.    That Defendants be required to compensate Plaintiff for the full value of wages he would have received had it not been for Defendants' illegal treatment of Plaintiff, with interest, in addition to reimbursement for lost pension, social security, experience, training opportunities and other benefits;

d.    That Defendants are required to provide Plaintiff with front pay if the Court determines reinstatement is not feasible;

e.    That Defendants be required to compensate Plaintiff for lost benefits, including profit sharing and/or pension benefits until Plaintiff's normal retirement date;

f.    That Plaintiff be awarded compensatory damages in an amount to be determined at trial;

g.    That Defendants be enjoined from discriminating or retaliating against Plaintiff in any manner prohibited by the PWL;

h.    That Plaintiff be awarded against Defendants the costs and expenses of this litigation, including a reasonable attorney's fee; and

24

  i.  That Plaintiff be granted such further legal and equitable relief as the Court may deem just and proper.

**Count III**
**<u>Breach of Contract</u>**

132. Plaintiff incorporates by reference the allegations in Paragraphs 1 to 131 as if fully restated herein.

133. Defendants breached the PEA, Section 1, by failing to treat Plaintiff fairly and similarly to other PHCVI physicians.

134. Defendants also breached the PEA, Section 15, by failing to reach the required super-majority, vote of the Board prior to determining that Plaintiff engaged in "for cause" misconduct.

135. Defendants also breached the PEA by falsely stating that Plaintiff lost his medical staff privileges.

136. As a direct and proximate result of Defendants' actions of breaching the PEA, Plaintiff has suffered and continues to suffer substantial economic and consequential damages, including lost back pay, loss of front pay, loss of retirement and pension benefits, and severe, potentially permanent damage to his professional reputation in the medical field.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor and against Defendants and award Plaintiff damages in an amount to be determined at trial, including the compensation and benefits Plaintiff would have received but for Defendants' breach, together with prejudgment interest, the costs of this action, and such other and further relief as the Court deems just and proper.

25

Respectfully submitted:

*/s/ Colleen E. Ramage*
Colleen E. Ramage
PA I.D. No. 64413

Nikki Velisaris Lykos
PA I.D. No. 204813

**Ramage Lykos, LLC**
525 William Penn Place
28th Floor
Pittsburgh, PA 15219
(412) 325-7700

cramage@ramagelykos.law
nlykos@ramagelykos.law

Attorneys for Plaintiff